[Crim. No. 24163. Second Dist., Div. One. Aug. 14, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK CLAYTON MARSHALL, Defendant and Appellant.

## COUNSEL

J. Anthony Kouba, under appointment by the Court of Appeal, and Arrigo & Kouba for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Russell Iungerich and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LILLIE, Acting P. J.**—The trial court found defendant guilty of second degree murder (§ 187, Pen. Code). He appeals from the judgment.[1]

Shortly after defendant, 17 years old, was arrested he was questioned by Officer Nuckles regarding the murder of Mop, his stepfather; in the conversation which was tape-recorded and transcribed he confessed he stabbed his stepfather to death. The magistrate excluded the confession but the trial court granted the People's pretrial motion pursuant to section 402, Evidence Code, to allow it in evidence. On the motion it was stipulated that the first eight pages of the transcript of the tape-recorded conversation and two pages (46 and 47—testimony of Officer Nuckles) of the transcript of the testimony taken at the preliminary hearing be admitted in evidence; after the court read and considered these documents, defendant testified.

The transcript of the tape-recorded conversation establishes that at the outset defendant was advised by Officer Nuckles of, understood and waived his rights under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The sole question is whether,

---

[1]Probation was denied and defendant was committed to the California Youth Authority. The appeal is properly one from the order of commitment (§§ 1737.5, 1739, subd. (a), Welf. & Inst. Code).

when defendant said he did not want to go back over the parts he left out, he was then invoking his Fifth Amendment privilege to remain silent.

Officer Nuckles told defendant he and Officer Varney were assigned Mop's case; other officers had previously talked to him [defendant]; and they had talked to a lot of people—"come across a lot of facts, and we'd like to hear your story, just what happened that day" (March 26, 1972). Defendant said they had some company that day and everybody was drinking; Mop got mad and ran everyone out of the house and he and his wife, Janice, went to the home of a friend; later that evening he saw Mop and his mother. Defendant was then asked the following questions to which he gave the following answers:

"Q. Do you know where Mop was found? A. (Unintelligible) . . . Q. Did you go to view the body? A. (Unintelligible) . . . around the corner there? A. Uh huh. A. No, I didn't go there. Q. So the next time you saw Mop was at the funeral? A. Yeah. Q. Okay. Well, like I told you, Frederick, we've talked to a lot of people, and when something like this happens, whether it be inside the, family or not, eventually the truth comes out, and we know the truth. So there's a lot of what you told us is true, but there's an awful lot that you left out. *So do you want to go back over the parts you left out?* [Italics added.] A. No. Q. Huh? Beg your pardon? A. No. Q. Why? A. I just don't want to. Q. See, we know how Mop was killed. Were you there when mama and Mop got into the fight? A. They didn't get in no fight. They got in an argument. Q. Well, whatever. You and Janice walked right in on it; didn't you?"

The questioning continued for 24 more pages and defendant confessed he and his wife returned to the house and he stabbed Mop to death because he was beating up his mother.

At the preliminary hearing Officer Nuckles testified that at the time he asked the three questions concerning Mop, defendant "briefly" had tears in his eyes and had reached an emotional state where he started to break down, and it was after this "momentary condition" the questioning was resumed and defendant continued; it was apparent to him that when asked if he wanted to go over the parts he left out, "that although [defendant] did not want to talk about it, it wasn't that, 'I don't want to talk about it because it is my right. I don't want to talk about it because I feel emotional about it.' "

As we are required, we view the evidence in a light most favorable to the trial court's ruling—that defendant's refusal to go back over the

parts he left out was the result of "a nervous reaction that he was having then," not an invocation of his Fifth Amendment privilege—and reject all contrary evidence.[2] (*People* v. *Randall,* 1 Cal.3d 948, 954 [83 Cal. Rptr. 658, 464 P.2d 114]; *People* v. *Carroll,* 4 Cal.App.3d 52, 58 [84 Cal.Rptr. 60].) ■ This view of the evidence establishes that three questions were asked of defendant—whether he knew where Mop's body was found, whether he went there to view the body, and whether the next time he saw Mop was at the funeral—then he was asked if he wanted "to go back over the parts [he] left out?", and twice defendant answered "No," and a third time, "I just don't want to"; and at that time defendant "briefly" had tears in his eyes, became emotional and began to break down, and it appeared to Officer Nuckles that defendant refused to go back over the parts he left out and did not want to talk about it because he felt "emotional about it," not "because it [was his] right." We conclude that defendant's unequivocal "No," in response to the question "do you want to go back over the parts you left out," amounted to a clear invocation of his Fifth Amendment privilege to remain silent foreclosing further interrogation; and that under the circumstances his reason for asserting that privilege is immaterial.

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. [Fn. omitted.] At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . ." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602].) This language was adopted by the California Supreme Court as the basis of its holdings in *People* v. *Burton,* 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall, supra,* 1 Cal.3d 948; *People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; and *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]. However, here there is no need to engage in speculation as to whether defendant's words or conduct "reasonably appears inconsistent with a present willingness on [his] part . . . to discuss his

---

[2]Defendant testified he was arrested at 8:30 or 9 a.m. and was "fairly high," upset and sleepy, had been drinking the night before and had gotten only four to five hours sleep; during interrogation he told police he did not want to talk to them any further "because of my emotional state and I wanted a lawyer," but did not tell them he wanted a lawyer; when he answered "No" to the question regarding the details he had left out he meant that he wanted a lawyer; he did not say that, "because he [Nuckles] didn't ask me"; they kept talking with him and he was "upset . . . kind of high and sleepy."

case freely and completely with police *at that time*" (*People* v. *Randall, supra,* 1 Cal.3d 948, 956) which would amount to an invocation of the Fifth Amendment privilege, as in *People* v. *Burton, supra,* 6 Cal.3d 375, 381 (a 16-year-old boy asked to see his parents); *People* v. *Randall, supra,* 1 Cal.3d 948, 957 (defendant made a telephone call to his attorney); *People* v. *Ireland, supra,* 70 Cal.2d 522, 533 (adult defendant said "call my parents for my attorney"); *People* v. *Fioritto, supra,* 68 Cal.2d 714 (defendant refused to sign a waiver of his constitutional rights); and *People* v. *Savala,* 10 Cal.App.3d 958, 962 [89 Cal.Rptr. 475] (silence in reply to accusatory statement). While in the foregoing cases the equivocal nature of defendant's words or conduct was at issue, here there is an unequivocal "No," not once but twice, and further confirmation thereof by the answer, "I just don't want to." This express assertion clearly shows an outright unwillingness of defendant *at that time* to go back over the parts he left out concerning the day of the homicide (which parts obviously incriminated him and later constituted his confession) and that he intended to exercise his Fifth Amendment privilege. Is there more defendant must say to invoke his privilege to remain silent than "No" when asked to explain or clarify or continue the conversation? Under the foregoing authorities he is not required to use any particular language to indicate his unwillingness at that time to discuss his case or to give any explanation or reason for refusing to continue with the interrogation. ■ Even in cases in which a suspect makes no express assertion, no particular form of words or conduct is necessary to constitute such an invocation. (*People* v. *Burton, supra,* 6 Cal.3d 375, 381-382.)

■ The People had the burden of demonstrating that the challenged confession meets the constitutional test of admissibility; and to contend as they do, that the refusal under the circumstances should not be considered an invocation of the privilege, they must affirmatively demonstrate that defendant "was not thereby indicating a desire to remain silent." (*People* v. *Randall, supra,* 1 Cal.3d 948, 957; *People* v. *Burton, supra,* 6 Cal.3d 375, 383.) They have established by Officer Nuckles that at the time, defendant was upset and emotional, and it well may have been that defendant was having, as described by the judge "a nervous reaction"; but whatever the reason for defendant's unwillingness to go over the parts he left out, his express negative assertion was a clear invocation of his privilege to remain silent, and such reason neither alters his unequivocal refusal nor converts it into a mere request for a momentary respite from questioning. It is difficult to imagine a young boy 17 years old under arrest, accused of murder and under interrogation by police who would not be upset or emotional. Nothing in the record shows that defendant was overcome to the point where he could not speak because of a "nervous

reaction" and that he was willing to continue when he recovered; there was not even a cessation of questioning by the officer who ignored defendant's declared unwillingness to continue and immediately launched into the interrogation that ultimately led to his confession.

█ It is true, as urged by respondent, that when a suspect is indecisive and ambiguous in his assertion of his Fifth Amendment rights, the officers may make further inquiries concerning it *(United States* v. *Nielsen,* 392 F.2d 849, 853), but at bench defendant's answer was neither indecisive nor ambiguous; he clearly said "No," and his reason for asserting his privilege to remain silent is immaterial. Further, Officer Nuckles made no inquiry concerning his assertion, but continued his interrogation as though defendant had not spoken. █ Finally, although *Miranda* does not prohibit subsequent admissions or confessions which are voluntarily initiated by defendant *(People* v. *Fioritto, supra,* 68 Cal.2d 714, 719) evidencing a change of mind not affected by official action, the further discussion here was brought about solely by continued police interrogation. *(People* v. *Brockman,* 2 Cal.App.3d 1002, 1008 [83 Cal.Rptr. 70].)

The judgment is reversed.

Thompson, J., and Hanson, J., concurred.