[Crim. No. 22185. June 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN WESTLEY HAYES, Defendant and Appellant.

## COUNSEL

Dennis A. Fischer, under appointment by the Supreme Court, Melissa Hill and Fischer & Hill for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Susanne C. Wylie, Howard J. Schwab and William R. Weisman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190.1 et seq.). We affirm the judgment as to guilt but set aside the special circumstance findings under compulsion of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826]. The Attorney General concedes this is the proper disposition.

The facts necessary to decide this appeal are undisputed. Defendant put on no defense at the guilt phase.

On July 5, 1980, defendant came up to the servicing window of Tom's Jr. hamburger stand on West Florence in Los Angeles. He drew a revolver and ordered the men working behind the counter not to move. When one of those men turned, defendant shot him once; the man, Ramond Vasquez, fell to the floor. Defendant climbed in through the window and another employee, Jorge Castro, jumped on him and grabbed the hand in which defendant held the gun. In the ensuing struggle the weapon discharged, wounding Castro in the leg. Defendant and a confederate then ordered Castro to open the cash register, seized some money, and fled. Vasquez died from his wound.

Nine days later defendant entered the Golden State Market on 84th near Main Street in Los Angeles, where Leonard Fong and his wife Susan were working. The precise movements of the parties thereafter are not absolutely

clear from the testimony.[1] It appears that defendant came up to the cash register and ordered Mrs. Fong to put the money in a bag. Instead she ducked behind the counter, and defendant shot her. Mr. Fong then went towards the same place, and defendant shot him. He also shot and wounded Yuk Chun Wong when she approached. Defendant and two confederates then took money from the register and fled. The wounds of Mr. and Mrs. Fong were fatal.

Defendant was arrested two days after the shootings at the Golden State Market and confessed both to those crimes and the crimes committed at the hamburger stand. The confession was tape recorded and played to the jury. During the interrogation the police asked defendant several times why he had fired his gun at the people he was robbing. He replied that they had each made sudden moves "real fast," and he believed they were reaching under the counter for a weapon. When asked if he meant to kill his victims, he expressly denied having any such intent. Under further questioning he offered two additional explanations for firing his gun: i.e., "I was just trying to wound them so I could get away," and "All I did was just try to scare them . . . ."

Defendant was charged with three counts of murder; as to each count it was charged as a special circumstance that the murder occurred while defendant was engaged in the commission of a robbery (Pen. Code, § 190.2, subd. (a)(17)(i)) and that he committed the two other murders charged (*id.*, subd. (a)(3)). He was also charged with four counts of robbery and one count of attempting to murder Yuk Chun Wong. At the close of the prosecution's case, defendant's motion for a judgment of acquittal on the latter count was granted. (*Id.*, § 1118.1.) The jury found him guilty as charged on the remaining counts and at the penalty phase returned a verdict of death on two of the murder counts. On the third murder count the jury was unable to agree on penalty, and defendant was sentenced to life imprisonment without possibility of parole for that crime.

■■■ Defendant makes only one claim of error in the guilt phase. Prior to trial he moved to suppress his confession on *Miranda* grounds. (Evid. Code, § 402.) At the hearing Officer Bunch testified that he gave defendant the required *Miranda* warnings, and defendant waived his rights and agreed to talk. Defense counsel did not dispute those facts, but argued only that after admitting his guilt defendant in effect invoked his right to cut off

---

[1]The sole surviving eyewitnesses were the Fongs' eight-year-old child and the child's grandmother, Yuk Chun Wong. The latter testified through an interpreter.

further questioning; the questioning nevertheless continued, and the officer elicited additional details of the crimes.[2]

Defense counsel asked Officer Bunch why he did not stop the interrogation when defendant said, "Do I gotta still tell you after I admit it?" The officer explained that as of that point in the questioning it was unclear to him exactly what defendant was "admitting," and he wanted to be sure defendant was speaking of the same crimes as the police. Officer Bunch took defendant's quoted remark to mean simply that although he was willing to confess to these crimes he was reluctant to go into their details. The trial judge then listened to the tapes twice, and found "there is no basis for this court to suppress that confession, and that will be the order."

Defendant now reiterates his claim of a violation of his right to cut off questioning. ■ That right has been recognized since the *Miranda* decision itself: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 718 [68 Cal.Rptr. 817, 441 P.2d 625].) ■ Whether the suspect has indeed invoked that right, however, is a question of fact to be decided in the light of all the circumstances: "A desire to halt the interrogation may be indicated in a variety of ways," and the words used by the suspect "must be construed

---

[2]The tape begins with the following colloquy:

"Q. [investigating officer]. We know about Vermont and Florence, Tom's Hamburger. We know about the market, 84th and Main. What we'd like from you is your side of it. We're just getting what these people are telling us— A. [defendant]. Well, actually it was self-defense.

"Q. Well, that's what we have to hear, you know. I don't know, I was not there. This man [i.e., another officer present] was not there. You were there. If it was self-defense, tell us so we know. A. Well, that dude was reaching for a gun, so I just shot him.

"Q. Okay. A. I admit to it, you know, no need to go—

"Q. Well, why don't you start with what happened over at Florence and Vermont. How that did that go down? A. Well, I did it all. It was self-defense.

"Q. Well, I know it, but what happened? A. Do I gotta still tell you after I admit it?

"Q. Yeah. All you're saying is, you admit it. We don't know what you're admitting to. A. I admit I shot somebody.

"Q. Well, who did you shoot? A. I don't know.

"Q. Was it just somebody on the street? A. Huh uh [i.e., no].

"Q. Somebody working in the hamburger stand? A. Yeah.

"Q. Black guy, white guy? A. It happened so fast, I don't know.

"Q. Okay, how did it happen?"

The questioning continued in the same vein for approximately 45 minutes, during which time defendant recounted how he committed the several crimes and his state of mind in doing so.

in context." (*In re Joe R.* (1980) 27 Cal.3d 496, 515 [165 Cal.Rptr. 837, 612 P.2d 927].)

■ We are cited to no case directly in point. Of the decisions relied on by defendant, only one is similar enough to deserve discussion.[3] In *People* v. *Marshall* (1974) 41 Cal.App.3d 129 [115 Cal.Rptr. 821], a minor was arrested and interrogated about the murder of his stepfather. He was duly advised of and waived his *Miranda* rights. He first denied being present at the killing, saying that he left the house when his stepfather began drinking and did not see him again until the funeral. Apparently disbelieving this story, the interrogating officer said that "we've talked to a lot of people . . . and we know the truth. . . . [T]here's an awful lot that you left out. So do you want to go back over the parts you left out?" The minor twice replied, "No." When asked why, he said, "I just don't want to." (*Id.* at p. 132.) The officer nevertheless persisted with the interrogation, and the minor finally confessed that he did return to the house and killed his stepfather because he was beating the minor's mother.

The Court of Appeal held (*id.* at p. 133) that on these facts "there is no need to engage in speculation" as to the meaning or effect of the minor's words: whatever the reason for his unwillingness to "go back over the parts [he] left out," his express and repeated refusal to do so was a clear invocation of his right to stop the questioning. (*Id.* at p. 134.) As the court rhetorically asked, "Is there more defendant must say to invoke his privilege to remain silent than 'no' when asked to explain or clarify or continue the conversation?" (*Ibid.*)

The present case differs from *Marshall* in two significant respects. First, the response of defendant here was not an express and repeated refusal to continue talking to the officers; rather he asked the single, ambiguous question whether he had to go into the details after having confessed to the fact of the shootings. Second, at the time of Marshall's refusal to talk he had not confessed to any criminal activity, but had given instead an innocent explanation of his connection with the events; here, by contrast, even before defendant asked the foregoing question he had already confessed that he "did it all" and had shot a man during a holdup.

---

[3]The others involved the question whether the suspect *initially* waived his right to remain silent before answering any police questions. (E.g., *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729 [125 Cal.Rptr. 798, 542 P.2d 1390]; *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall* (1970) 1 Cal.3d 948 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Williams* (1979) 93 Cal.App.3d 40 [155 Cal.Rptr. 414]; *People* v. *Munoz* (1978) 83 Cal.App.3d 993 [148 Cal.Rptr. 165]; *People* v. *Parker* (1975) 45 Cal.App.3d 24 [119 Cal.Rptr. 49].)

More similar to the case at bar is *In re Joe R., supra,* 27 Cal.3d 496. There a minor suspected of committing a robbery-murder was questioned after waiving his *Miranda* rights. At first he gave an exculpatory version of his involvement in the events; when the interrogating officer accused him of lying and produced inculpatory evidence found at his house, the minor said, "That's all I got to say" or "That's all I want to tell you." (*Id.* at p. 513.) The officer nevertheless continued the interrogation and the minor confessed to the robbery. The trial court found that in making the quoted remark the minor was not trying to stop the questioning but was simply reaffirming his prior story. On appeal, this court rejected the minor's contention that he had been denied his right to withdraw his *Miranda* waiver; viewing the remark in context, we held it was not unreasonable for the trial court to adopt the prosecution's view of the meaning of that remark, and thus to find no violation of the privilege against self-incrimination. (*Id.* at p. 516.)

Here, too, the trial court could reasonably have endorsed the inference drawn by the interrogating officer—i.e., that taken in context defendant's remark meant that although he was willing to confess to the crimes he was uncomfortable about going into their details. Such reluctance is an understandable reaction to a confession of multiple robbery-murder, and does not rise to the level of an implied assertion of the defendant's constitutional right to cut off questioning.

■ Defendant correctly contends, however, that the court committed prejudicial error in the instructions on the special circumstance allegations. The court instructed the jury to find each felony-murder special circumstance allegation true if it found that the murder was committed while defendant was engaged in the commission of a robbery and for the purpose of facilitating that crime or an escape therefrom, or to avoid detection. The court did not instruct the jury that it could not find such allegations true unless it also found that defendant intended to kill the robbery victims.

The failure to so instruct was error under *Carlos v. Superior Court, supra,* 35 Cal.3d 131, 152-154, which held that the 1978 death penalty law must be construed to require proof of intent to kill as an element of a felony-murder special circumstance.

The case at bar was pending when *Carlos* was decided, and hence is governed by that rule. (*People v. Garcia, supra,* 36 Cal.3d 539, 547-549.) *Garcia* declares the error reversible per se (*id.* at pp. 549-554), with four narrow exceptions (*id.* at pp. 554-556). At oral argument the Attorney General conceded that the case falls within none of these exceptions as we have construed them in our recent decisions. Nevertheless we have reviewed the

record, and conclude that it fully supports the Attorney General's confession of error.

In his brief on appeal the Attorney General invoked the so-called *Cantrell-Thornton* exception, described as "cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (36 Cal.3d at p. 556.)

The exception is inapplicable on this record. To begin with, there is no showing that the parties recognized that intent to kill was an issue as far as the felony-murder special circumstance allegations were concerned. On the contrary, after the prosecution rested defense counsel specifically objected that the proposed special circumstance instruction was unconstitutional on the ground, inter alia, that it did not require anything more than "a finding of robbery-murder"—i.e., the same finding that would be sufficient to support a *conviction* on the prosecution's felony-murder theory. The court reaffirmed its intention to give the instruction as written, and the defense rested without offering any evidence.

The Attorney General contended that intent to kill was nevertheless an issue because the court also instructed on a theory of murder by premeditation and deliberation. But throughout the trial the prosecutor emphasized the evidence that defendant was in the process of robbing his victims at the time he fired the fatal shots, and in his closing argument he barely touched on the question of premeditation and deliberation; instead, he repeatedly told the jurors in effect that all they needed to find on each murder count was a killing in the course of a robbery.[4] We have no way of knowing, of course, which theory the jurors relied on for their ensuing verdicts of first degree murder.

Second, the record does not establish as a matter of law either that defendant intended to kill or that his contrary evidence was not worthy of consideration. The Attorney General stressed that defendant shot all three murder victims at "point blank range"; but that fact does not legally foreclose the possibility that defendant, as he told the police, may have pulled the trigger either because he believed it was necessary for self-defense, or because he meant only to frighten his victims into submission, or because

---

[4]For example, after reviewing his evidence the prosecutor told the jury, "You may not feel that this is a case of premeditated murder. You don't have to feel that way to find first degree murder, because anyone who kills someone during the course of a robbery is guilty of first degree murder, and that's why I say the evidence in this case shows beyond any doubt whatsoever that Mr. John Hayes is guilty of three counts of first degree murder . . . ."

he wished to disable them in order to make his escape. His statements to this effect were not inherently incredible, nor was his unqualified denial of an intent to kill anyone. (See *People* v. *Anderson* (1985) 38 Cal.3d 58, 62 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 148 [207 Cal.Rptr. 800, 689 P.2d 430].)

We conclude that the issue whether defendant entertained a specific intent to kill in this case remains very much a question of fact. It is not the function of this court to resolve such factual disputes; the question is for the jury under proper instructions.[5]

Because the felony-murder special circumstance findings must be set aside for violation of the *Carlos* rule, the multiple-murder special circumstance findings predicated thereon are likewise invalid. (*People* v. *Turner* (1984) 37 Cal.3d 302, 328-329 [208 Cal.Rptr. 196, 690 P.2d 669].)

Accordingly, we need not reach defendant's claims of error on the penalty phase. Because the invalid special circumstance findings were the sole basis for conducting that proceeding, the verdict as to penalty is unsupported as a matter of law and must likewise be set aside.

The judgment is affirmed as to guilt. The special circumstance findings are set aside. The judgment is reversed as to penalty.

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**LUCAS, J.**—I concur with the majority opinion to the extent it affirms the judgment as to defendant's guilt. I also concur with the remaining portion of the judgment setting aside the special circumstances finding and reversing the penalty of death, but only under the compulsion of *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. For reasons I have previously expressed, I disagree with the holdings in

---

[5]That a reasonable trier of fact could have found a lack of intent to kill in this case is shown by the trial court's ruling on defendant's motion for a judgment of acquittal on the count charging him with attempted murder of Yuk Chun Wong. A specific intent to kill is a necessary element of that crime. (*People* v. *Collie* (1981) 30 Cal.3d 43, 62 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) In support of the motion, counsel stressed defendant's statements to the police to the effect that he did not intend to kill anyone and meant only to fire his gun to facilitate his escape. Counsel also reminded the court that a conviction of attempted murder may not rest on a felony-murder theory. The court granted the motion for acquittal. Yet with respect to whether defendant intended to kill, the evidence of the shooting of Yuk Chun Wong is not significantly different from the evidence of the shooting, moments earlier, of Mr. and Mrs. Fong.

those cases (see *People* v. *Whitt* (1984) 36 Cal.3d 724, 749 [dis. opn.] [205 Cal.Rptr. 810, 685 P.2d 1161]), but (as conceded by the Attorney General) they do appear to control the disposition of the present case.