[No. B019203. Second Dist., Div. Three. Dec. 8, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
GILBERT RODRIGUEZ, Defendant and Appellant.

COUNSEL

Ronald N. Ito, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Donald E. de Nicola and William H. Davis, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DANIELSON, Acting P. J.**—Gilbert Rodriguez appeals from the judgment entered following a jury trial that resulted in his conviction of the first degree murder of David Hernandez (Pen. Code, § 187) with an attending

"special circumstance" (Pen. Code, § 190.2, subd. (a)(2)), and the attempted murders of Anthony Crespin, Manuel Sanchez, Rogelio Rodriguez, and Javier Huerta (Pen. Code, §§ 664, 187). The jury found appellant personally used a firearm in committing each of the offenses (Pen. Code, § 12022.5), and intentionally inflicted great bodily injury upon one of the attempted murder victims, Rogelio Rodriguez (Pen. Code, § 12022.7).

Appellant was sentenced to state prison for a term of life without the possibility of parole for the special circumstance murder and concurrent terms of seven years for each of the attempted murders. Each of the latter terms was enhanced by two years for firearm use; one such enhancement period was stayed pursuant to the decision in *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23], and a second such enhancement period, for use of a firearm in attempting to murder Rogelio Rodriguez, was stayed pursuant to Penal Code section 1170.1. The term imposed for the latter offense was enhanced by three years for intentional infliction of great bodily injury.

## CONTENTIONS

Appellant contends: (1) the police impermissibly detained him for an in-field showup, (2) the showup was impermissibly suggestive, (3) the trial court abused its discretion in admitting in evidence a green jacket, (4) the court erred in ruling inadmissible the report of the autopsy of one Frank Rodriguez, and (5) the jury's finding on the special circumstance allegation, i.e., that appellant was previously convicted of second degree murder, must be reversed because the People failed to prove appellant intended to kill the victim of that offense.

## FACTS

We view the evidence in the light most favorable to the judgment, in accordance with the usual rule governing appellate review. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110].)

Appellant's nephew, Robert Rodriguez, who was associated with the Venice 13 gang, was shot to death on July 12, 1983. Three Culver City gang members, including David Hernandez, were arrested for the murder but released without being charged when the police determined they were elsewhere at the time of the killing. Two other Culver City gang members were then charged with the murder of Rodriguez; in juvenile court proceedings held on February 9 and 10, 1984, it was determined that they were not responsible for the killing.

On the evening of February 11, 1984, the victims Sanchez and Crespin, both Culver City gang members, were walking near the Mar Vista Gardens Recreation Center when appellant drove up in his father's gray Pinto, got out of the vehicle carrying a rifle, and fired one shot at them. Sanchez and Crespin fled, chased by appellant, who fired several more shots at them as they ran. The victims ultimately reached Crespin's house, where they called the police.

Meanwhile, appellant moved the Pinto a short distance, parked it in the middle of the street, got out carrying what appeared to be a gun wrapped in a green jacket,[1] and chased Rigo Contreras to Sanchez's nearby home. Contreras entered the house, slammed the door and braced his foot against it. The next day, he observed a half-circle mark on the door.

Appellant returned to the Pinto, placed the object on its back seat, entered the vehicle and drove off.

Shortly thereafter, Huerta, Rogelio Rodriguez, Hernandez and another person were drinking beer and talking near the Mar Vista Gardens apartments of Rodriguez and Hernandez when appellant approached, carrying a shotgun wrapped in a white towel or shirt, yelled, "Keep out of Chukos,"[2] fired a shotgun blast, yelled, "This is what you punks get. This is what you motherfuckers get," and fired several more blasts, moving the gun around and shouting, "You want some more? You guys want it?" Rodriguez was hit by the second blast, and spent five days in the hospital recovering from wounds in his upper left leg and buttock, as well as his arm and hand. Huerta was shot in the leg. Hernandez was shot twice at close range, and died on February 14, 1984, as a result of shotgun wounds to his head.

Officers responding to the call made by Sanchez and Crespin found .22 caliber shell casings in the area of the assault upon them. The officers heard the later shotgun blasts and chased appellant, eventually losing sight of him.

On February 12, 1984, police officers went to an apartment on Mitchell Avenue, where they observed the grey Pinto, and conducted an in-field showup of appellant and three of his brothers. Contreras, Crespin, and Danny Hernandez, brother of David Hernandez, identified appellant as the perpetrator of the offenses. Two days later, Crespin and Contreras identified appellant as the perpetrator at a formal lineup. Sanchez and Danny Hernandez each selected another person, but also observed that appellant, who had combed his hair differently for the occasion, could be the perpetrator.

---

[1] One of the witnesses to this incident described the material covering the object as a white towel.

[2] The "Chukos" were Venice 13 gang members.

Contreras and two other witnesses identified appellant's picture in a photographic display.

DISCUSSION

*Appellant Was Properly Detained For An In-field Showup*

■ Appellant contends the police improperly detained him for an in-field showup because he was at most a "possible" suspect.

■ "To legally detain an individual because of 'suspicious circumstances,' the prosecution must establish on the record that at the moment of the detention, there were specific and articulable facts, which reasonably caused the officer to believe that (1) some activity out of the ordinary had taken place or was occurring or about to occur; (2) the activity was related to crime; and (3) the individual under suspicion was connected to the activity. [Citation.] The prosecution must show that the officer personally entertained such suspicions and that these were objectively reasonable. [Citation.] If the underlying facts fail to reasonably 'distinguish [the suspected individual] from any other citizen . . . at that time and place,' the detention is not justified. [Citations.]" (*People* v. *Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115].)

■ In the present case, the last of the shootings occurred at 11:30 to 11:45 p.m. on February 11, 1984. Through the ensuing night, the police interviewed approximately one dozen witnesses to the crimes, obtaining descriptions of the perpetrator and his vehicle.

The suspect was described as a male Hispanic. Witnesses to the initial assaults described him as 20 to 30 years old, with black hair, a mustache and beard and wearing a beige jacket and dark pants. Witnesses to the murder described the suspect as 5 feet 7 inches tall, weighing approximately 155 pounds, 17 to 23 years old, wearing a beige or light green jacket. The vehicle was described as a primer gray 1970 to 1974 Ford Pinto.

A computer search was made of field interview records to locate all vehicles in the area fitting the description of the suspect's vehicle. Sometime between 4 and 6 a.m. the following morning, this search led the police to the Pinto owned by appellant's father, Gilbert Rodriguez, Sr.

Detective Richard Taft, who knew the victims of the instant crimes were members of the Culver City gang, had been present in juvenile court on February 10, when the hearing was conducted with respect to the killing of appellant's nephew, Robert Rodriguez, and knew of Rodriguez's

connection with the Venice 13 gang, as well as appellant's status as a "veterano," or veteran, of that gang. Taft believed the present crimes might have been committed in retaliation for the death of Robert Rodriguez, and that a member of the Rodriguez family might be responsible for them.

Taft went to the Rodriguez residence on Mitchell Avenue early on the morning of February 12, 1984. The Pinto, with its engine still warm, was present at the residence, as were appellant and three of his brothers. Appellant was described by the detective as 28 years old, 5 feet 8 inches tall, 180 to 185 pounds, wearing black pants and a white T-shirt. Appellant's brother Frank Rodriguez was described as 25 years old, 5 feet 11 inches tall, weighing 220 pounds, with black hair, brown eyes and a mustache. He wore a white T-shirt and blue jeans. Another brother, Eddie Rodriguez, was described as 38 years old, 5 feet 7 inches tall, weighing 175 pounds, with brown hair and brown eyes, wearing a red windbreaker, a white T-shirt, green pants and a red and blue baseball cap. The third brother, Gilbert Manual Rodriguez, was described as 5 feet 6 inches tall, weighing 185 to 200 pounds, with salt and pepper colored hair and brown eyes. He wore a white T-shirt and blue jeans.

The officers present at the Mitchell Avenue location conducted an in-field showup for the purpose of eliminating some or all of the Rodriguez brothers as suspects. The procedure commenced at approximately 9 a.m. when Detective Taft returned to the Mar Vista Gardens after picking up the witnesses.

We are here concerned only with the third prong of the detention test set forth above, i.e., whether the officer reasonably believed appellant was connected to the shootings. Detective Taft testified he believed any one of the Rodriguez brothers could be the perpetrator, as all were within the general descriptions provided by the witnesses. In light of the conflict between the Culver City and Venice 13 gangs, the recent apparently gang-related killing of Robert Rodriguez, David Hernandez's arrest and release for that offense, and the use of the gray Pinto by the perpetrator of the present offenses, the officer's belief was reasonable. Appellant and his brothers were reasonably detained for the purpose of conducting an in-field showup to eliminate any or all of them as suspects. Contrary to appellant's assertions, the officer was not required to narrow the suspects to one in order to justify the procedure.

*The Showup Was Not Impermissibly Suggestive*

Appellant contends the in-field showup was impermissibly suggestive, in that it was not conducted promptly following commission of the offenses, appellant and his brothers vary significantly in physical appear-

ance, and the showup was conducted at their residence in the presence of the gray Pinto.

■ "A 'lineup' is a relatively formalized procedure wherein a suspect, who is generally already in custody, is placed among a group of other persons whose general appearance resembles the suspect. The result is essentially a test of the reliability of the victim's identification. [Citation.] . . . An in-the-field showup, on the other hand, is generally an informal confrontation involving only the police, the victim and the suspect. One of its principal functions is a prompt determination of whether the correct person has been apprehended. [Citation.] Such knowledge is of overriding importance to law enforcement, the public and the criminal suspect himself. [Citation.] An in-the-field showup is not the equivalent of a lineup. The two procedures serve different, though related, functions, and involve different considerations for all concerned." (*People* v. *Dampier* (1984) 159 Cal.App.3d 709, 712-713 [205 Cal.Rptr. 728].)

■ At the hearing on the motion to suppress eyewitness identification testimony (Evid. Code, § 402), counsel for appellant argued only that a formal lineup should have been conducted. This, of course, was not required. (*People* v. *Dampier, supra,* 159 Cal.App.3d at pp. 712-713.) The record shows the identification procedure was conducted as soon as the officers investigating the shootings, some of whom were on the scene before the last occurred, pieced together sufficient information to suggest participation by some member of the Rodriguez family, located the family, and transported the witnesses to their location. The shootings occurred shortly before midnight on February 11; the identification procedure began at approximately 9 a.m. on February 12. The procedure was promptly conducted in the circumstances. (*People* v. *Nash* (1982) 129 Cal.App.3d 513, 518-519 [181 Cal.Rptr. 145].)

Whether or not the Rodriguez brothers closely resembled one another is not crucial to the legality of the in-field showup. As Detective Taft testified, had only one of the suspects been present, that suspect would have been shown to the witnesses. ■ It is well settled that "weighing the respective individual and societal interests to be served," the advantages of prompt identification or elimination of suspects through an in-field showup outweigh the potential prejudice of such a procedure to the suspect. (*People* v. *Dampier, supra,* 159 Cal.App.3d 709, 713, quoting *People* v. *Jones* (1981) 126 Cal.App.3d 308, 317 [178 Cal.Rptr. 818].)

■ Finally, there is nothing in the record of the hearing indicating whether or not the gray Pinto was seen by the witnesses brought to the

identification scene, much less whether or not their identifications of appellant were affected by the presence of the vehicle.

The identification procedure, whereby the witnesses were shown the four suspects after being admonished that the shooter might or might not be among them, then separately interviewed by the police as to their responses to the viewing, was in all respects properly conducted. We find no error in the trial court's denial of appellant's motion to suppress eyewitness identification testimony.

*The Green Jacket Was Properly Admitted*

■ Appellant contends the trial court erred in admitting a green jacket brought to him at the police station by his sister, Amelia Ortega. He urges, as he did at trial, that the prosecution failed to establish his ownership of the jacket. He also urges, for the first time on appeal, that the probative value of this evidence was outweighed by its prejudicial effect. (Evid. Code, § 352.) Having failed to object on the latter ground at trial, appellant has waived the point on this appeal. (Evid. Code, § 353; *People* v. *Szeto* (1981) 29 Cal.3d 20, 32 [171 Cal.Rptr. 652, 623 P.2d 213].)

The witnesses to the shootings described the perpetrator as wearing a beige or green jacket. In addition, one of the witnesses described the rifle used in the first shootings as having been wrapped in a green jacket. Following appellant's arrest, Ortega was asked to bring him some clothing, including a jacket, as it would be cold in jail. Among the items delivered by Ortega to the police station was a green jacket with fur on it. The trial court could reasonably infer that appellant had a possessory interest in the jacket, and did not abuse its discretion in ruling the evidence admissible.

*The Autopsy Report Was Properly Ruled Inadmissible*

■ Appellant's brother, Robert Rodriguez, testified that on June 15, 1985, he engaged in a conversation concerning appellant's trial with his brother, Frank Rodriguez, wherein he asked Frank, " 'Well, do you know that Gilbert's court date is coming up in a week?' " According to Robert, Frank responded, " 'Yes,' " and stated, " 'Not to worry about that. Gil won't be riding my beef.' " Frank died on July 23, 1985.

Counsel for appellant moved to introduce the report of Frank's autopsy for the purpose of establishing that he died as a result of gunshot wounds to his head. Counsel apparently sought to indicate to the jury that Frank Rodriguez was the victim of a retaliatory homicide, and thus lend credence

to Robert's testimony concerning Frank's statements to him. The trial court ruled the report inadmissible.

In the absence of any showing that Frank was killed by the Culver City gang, much less that he was killed in retaliation for the crimes with which appellant was charged, the report of his autopsy was utterly without probative value, and properly ruled inadmissible. (Evid. Code, § 352; *People* v. *Perry* (1980) 104 Cal.App.3d 268, 270 [163 Cal.Rptr. 522].)

*The Jury Properly Found A Special Circumstance Within The Meaning Of Penal Code Section 190.2, Subdivision (a)(2)*

■ Appellant contends he was denied equal protection and subjected to cruel and unusual punishment by reason of the special circumstance finding pursuant to Penal Code section 190.2, subdivision (a)(2),[3] in that the prosecution was not required to prove he intended to kill the victim of his prior second degree murder.

Appellant's argument is based upon the reasoning of the decisions in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], and *People* v. *Malone* (1985) 165 Cal.App.3d 31 [211 Cal.Rptr. 210]. In *Carlos,* the Supreme Court held that a felony-murder special-circumstance finding under subdivision (a)(17)[4] of section 190.2 required an intentional killing. In *Turner,* the defendant was convicted of two counts of first degree felony murder for killing two people during the commission of a burglary. The court determined that in the absence of any finding of intent to kill, neither the felony-murder special circumstance described in subdivision (a)(17) nor the multiple-murder special circumstance described in subdivision (a)(3)[5] applied. (See also *People* v. *Hays* (1985) 38 Cal.3d 780, 788

---

[3] Section 190.2 provides, in pertinent part: "(a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true: . . . . [¶] (2) The defendant was previously convicted of murder in the first degree or second degree. . . ."

[4] Subdivision (a)(17) describes the felony-murder special circumstance as follows: "The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies: [¶] (i) Robbery in violation of Section 211. [¶] (ii) Kidnapping in violation of Sections 207 and 209. [¶] (iii) Rape in violation of Section 261. [¶] (iv) Sodomy in violation of Section 286. [¶] (v) The performance of a lewd or lascivious act upon the person of a child under the age of 14 in violation of Section 288. [¶] (vi) Oral copulation in violation of Section 288a. [¶] (vii) Burglary in the first or second degree in violation of Section 460. [¶] (viii) Arson in violation of Section 447."

[5] Subdivision (a)(3) creates a special circumstance where "The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree."

[214 Cal.Rptr. 652, 699 P.2d 1259].) In *Malone,* a felony-murder special circumstance finding ((subd. a)(17)) was rejected by the trial court for lack of a showing that the defendant intentionally aided and abetted his accomplice in committing the murder. (Pen. Code, § 190.2, subd. (b).)[6] However, the court determined the defendant had suffered a previous second degree murder conviction within the meaning of section 190.2, subdivision (a)(2), and sentenced him to life imprisonment without the possibility of parole. The appellate court, citing *Carlos* and *Turner,* held application of the special circumstance of murder with a prior murder conviction was precluded by the trial court's finding that the defendant was not the actual killer and did not intentionally aid and abet another in the commission of the first degree murder.

In *Carlos* and *Turner,* the court discerned from the language of subdivision (b) of section 190.2 (fn. 6, *ante*) an intent on the part of the voters in adopting Proposition 7 to require that a person, whether the killer or an aider and abettor, harbor an intent to kill before being subject to capital punishment under the special circumstances provisions of subdivisions (a)(3) and (a)(17).

In a very recent decision, our Supreme Court overruled *Carlos* and held: "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abettor rather than the actual killer, intent must be proved." (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) The court also overruled *Turner* "to the extent it holds that intent to kill is an element of the multiple-murder special circumstance," and adopted the following rule: "intent to kill is not an element of the multiple-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved." (*Id.* at pp. 1149-1150.)

The present case differs from *Carlos, Turner, Malone,* and even *Anderson,* in that subdivision (b) is by its terms inapplicable to subdivision (a)(2), and appellant's intent to kill his latest victim was established by his conviction of premeditated murder under Penal Code section 189. Moreover, in the prior second degree murder case, where appellant entered a guilty plea, the record of the plea proceeding established that he admitted shooting the

---

[6] Section 190.2, subdivision (b) provides: "Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true."

victim, and personally using a firearm in committing the offense. He was therefore not an aider and abettor, but rather, the actual killer.[7] The trial court properly determined the prosecution was not required to prove appellant intended to kill the victim of his prior second degree murder.

## DECISION

The judgment is affirmed.

Arabian, J., and Baker, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied March 24, 1988.

---

[7]Evidence adduced at the penalty phase of appellant's trial established that on October 1, 1977, appellant, armed with a rifle, stood at the corner of Fifth and Broadway in Los Angeles, where a number of teenagers were "hanging around," pointed the rifle at one Kirk Hamilton, then turned and fired a number of shots in the opposite direction at a group of approximately 50 people, hitting two of them. Appellant ran, followed by Hamilton, who heard two more shots and then saw the murder victim, Lloyd Hamm, lying on the ground and appellant running away. Hamm, shot in the back six times, died of his wounds.

* Assigned by the Chairperson of the Judicial Council.