Filed 11/17/21  P. v. Jacinto CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN CHAVEZ JACINTO,<br><br>    Defendant and Appellant. | F079361<br><br>(Super. Ct. No. MCR055165)<br><br>**OPINION** |

-ooOoo-

**THE COURT**[*]

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P. J., Franson, J. and Meehan, J.

## INTRODUCTION

Appellant Juan Chavez Jacinto was convicted by jury of possession of methamphetamine with the intent to sell (Health & Saf. Code, § 11378) and providing a false identity to a police officer (Pen. Code, § 148.9, subd. (a)).  On appeal, he contends the trial court erred by failing to suppress statements he made to police in violation of *Miranda v. Arizona* (1966) 384 U.S. 436.  We affirm.

## PROCEDURAL HISTORY

On July 7, 2017, the Madera County District Attorney's Office filed an information charging Jacinto with possession of methamphetamine with the intent to sell (Health & Saf. Code, § 11378) and providing a false identity to a police officer (Pen. Code, § 148.9, subd. (a)).  The information further alleged Jacinto had suffered three prior felony convictions within the meaning of Health and Safety Code section 11370.2, subdivision (c).

On March 26, 2019, following a motion by the prosecutor, the trial court dismissed the Health and Safety Code section 11370.2, subdivision (c) special allegation.

On April 4, 2019, Jacinto was convicted by jury of both counts.

On May 1, 2019, the trial court sentenced Jacinto to a term of three years in state prison.

On May 20, 2019, Jacinto filed a timely notice of appeal.

## FACTS

### *The Underlying Crime*

Jacinto, who referred to himself on social media as "Antonio Flores," was reportedly selling narcotics out of his home.  Following surveillance of Jacinto's home, police obtained a warrant to search the property.  On November 16, 2016, officers searched Jacinto's home.

2.

Jacinto was detained upon arrival. He initially identified himself as "Antonio Chavez Flores," and provided officers with a false date of birth. Jacinto stated that he lived at the home by himself.

During their search, police officers found a coffee can inside of Jacinto's kitchen cabinet. Inside of the can, and hidden underneath some coffee grounds, officers found approximately 82.4 grams of methamphetamine. Following a *Miranda* admonition, Jacinto acknowledged there was methamphetamine inside of the coffee can. He admitted he had been selling methamphetamine for the past eight months but claimed he only makes about $200 a week from doing so.

Police officers also found $851 in cash inside of Jacinto's home, four envelopes in a backpack containing a large amount of cash, a digital scale, plastic baggies, pay/owe sheets, more methamphetamine, and a calendar which appeared to note drug sales. The total amount of currency seized from Jacinto's home was $13,879, and the net weight of the methamphetamine recovered was 298 grams. Jacinto admitted the cash inside of the envelopes recovered by police were profits from his sales of methamphetamine.

Madera County Sheriff's Office Corporal Miguel Hernandez, who participated in the search of Jacinto's home, testified as an expert on the possession of controlled substances for purposes of sales at Jacinto's trial. He opined that Jacinto possessed methamphetamine for purposes of sales based upon the following: the quantity of methamphetamine and cash in Jacinto's possession, as well as the digital scale, baggies, and pay/owe sheets located in his home. Hernandez testified that a typical user of methamphetamine would not have the means to obtain the quantity of methamphetamine Jacinto had in his possession, which amounted to well over half a pound.

### Jacinto's Statements to Police

Jacinto's interrogation occurred at his home, in three parts. During the first part, Detective Hector Garibay with the Madera Police Department translated statements by Sergeant Josiah Arnold into Spanish. Garibay also admonished Jacinto pursuant to

3.

*Miranda* and asked Jacinto whether he understood his rights. Jacinto responded affirmatively, nodding his head. According to Garibay, Jacinto agreed to speak to him by nodding his head.

Garibay told Jacinto the police were at his home to serve a search warrant following an investigation for drugs. Garibay explained that police were seeking "to catch the bigger drug dealer," in other words, Jacinto's supplier. He asked Jacinto to answer questions honestly, and if Jacinto did not want to answer a question, to tell the officer that he did not want to answer, and they would respect that and move on.

During the second part of the interrogation, the following exchange occurred:

> "[GARIBAY]: Um, the boy will come out right now, … is possible that … we will talk to him about … what's happening, where do you buy it and … do you want it just like that? Understand … that, … we work like this, see, … if someone wants to help himself, we … ask him, you hear, where is it from. You can do something — you can, … I … don't know how to say it in Spanish, but, … *use the person to order more drugs and see if they arrive*. [*A*]*nd if you give us enough evidence that someone else is selling … this case will be erased*. But you won't be able to return, … it's something — that is how we work, once you give us information … and we capture the one that is selling more quantity. It's … an option. You don't have to, and I don't want to put you in danger, because sometimes there is danger, right. *But I don't know where this drug is coming from. If you are the one*, *everything finishes here*, *but I know there is more people that want*, *ah*, *that are selling you. And that is what we want*. Because this … happens every day. This … is something we grab, this is nothing for us, but … for … someone like you, it's something, many jail. But if you want to work with us, just … *you tell me and we can go to the police department*, *take a sit*, *explain* [*to*] *you how everything works*, *and then you decide if you want to do it*. Because there is many drug there, enough. … Um, are you thinking about it? Do you need more time? How is it? Or, you don't want to

say anything?  Te-tell me sir.  You don't want to ta-talk with me?

"[JACINTO]:  No.

"[GARIBAY]:  You don't want to say anything.  Are you sure?

"[JACINTO]:  Yes.

"[GARIBAY]:  Sir, it's an option, it's all.  I am not — not putting pressure on you, but *if you really don't want to speak about this, ah, it ends here and you will go to jail and* — but I am telling you seriously, ah, this is how we work.  You have like five minutes, if -if you want to change your mind you let me know, but after those five minutes I -I won't be able to speak with you about this.  Okay?  Okay.  [Speaking to Arnold.]  Let's go over here."  (Italics added.)

Garibay then spoke to Arnold about what he had just told Jacinto.  Several minutes later, the third part of the interrogation commenced.  In response to police questioning, Jacinto admitted he lived alone, that he possessed methamphetamine found in his home, that he had been selling methamphetamine for approximately eight months, and he made approximately $200 a week from doing so.

***The Evidence Code Section 402 Hearing***

On the day Jacinto's jury trial commenced, defense counsel moved to exclude Jacinto's post-*Miranda* statements to Garibay.  The trial court held an Evidence Code section 402 hearing.

At the hearing, defense counsel initially argued Jacinto had clearly indicated he did not want to speak to Garibay during the interrogation, and that in response, Garibay stated he would give Jacinto more time "to think about it, whether or not to speak."  After telling Jacinto he would "go to jail," Garibay simply resumed his interrogation.

Garibay testified that Jacinto was refusing to speak with him concerning who had supplied Jacinto with the methamphetamine.  Thus, Jacinto's refusal to speak was

5.

specific to Garibay's request for information concerning the identity of Jacinto's supplier. Following Garibay's testimony, the prosecutor argued that under the circumstances, all other portions of the interview were admissible as Jacinto had not invoked his *Miranda* rights.

Defense counsel further argued Jacinto had not waived his right to remain silent. Although Jacinto had nodded his head affirmatively after he was admonished pursuant to *Miranda*, defense counsel asserted that Jacinto did not understand Garibay's *Miranda* warning. Defense counsel declined to have Jacinto testify at the Evidence Code section 402 hearing to support his claim.

In response to defense counsel's claims, the trial court asked Garibay about his Spanish language skills. Garibay explained that Spanish is his first language, he speaks with his family exclusively in Spanish, and that he acts as an interpreter for his department almost daily. Garibay had no concerns about whether Jacinto had understood him during the interrogation; he spoke slowly and clearly during the interrogation.

After reading the transcript of Jacinto's police interrogation, the trial court ruled Jacinto's statements were admissible. The trial court found Jacinto had understood his *Miranda* rights, and that he did not invoke them at any point during the three-part interrogation. At one point, Garibay was attempting to get information from Jacinto concerning his supplier, but Jacinto refused to speak with Garibay about his supplier. However, Jacinto did not indicate that he was refusing to speak to Garibay generally.

## DISCUSSION

### I. Jacinto Did Not Clearly and Unambiguously Invoke His Right to Remain Silent

Jacinto claims the trial court erred in concluding his post-*Miranda* statements to police were admissible because he invoked his right to remain silent. Following our independent review of the record, we find no evidence showing that Jacinto invoked his right to remain silent during the course of his police interrogation. Although Jacinto

6.

directs us to portions of the record which he contends shows a clear invocation of his *Miranda* rights, the full context of the record makes clear that Jacinto was specifically declining to provide information about his supplier. He was not invoking his right to remain silent. We therefore conclude the trial court did not err by admitting Jacinto's statements to police at his trial.

## A.     Relevant Legal Principles

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374.)

In *Miranda,* the United States Supreme Court held that to protect the federal constitutional right against self-incrimination, "any person who is suspected or accused of a crime and who has been taken into custody or otherwise restrained may not be interrogated by the police unless he [or she] first knowingly and intelligently waives his [or her] right to silence, to the presence of an attorney, and to appointed counsel if indigent." (*People v. Ray* (1996) 13 Cal.4th 313, 336.)

"The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions. Any waiver, express or implied, may be contradicted by an invocation at any time. If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 387−388.)

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or counsel." (*People v. Stitely* (2005) 35 Cal.4th 514, 535.) "It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights." (*Ibid.*) "Faced with an ambiguous or equivocal statement, law

7.

enforcement officers are not required under *Miranda v. Arizona*, *supra*, 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether." (*Stitely*, at p. 535.)

The accused must therefore "articulate his desire to [remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an invocation of the right to remain silent]." (*Davis v. United States* (1994) 512 U.S. 452, 459; *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. 381.) A reviewing court may look to the conduct of the accused "before, during, and after the statements" (*People v. Jennings* (1988) 46 Cal.3d 963, 978−979), to determine what " ' "a reasonable officer in light of the circumstances would have understood" ' " the accused's statements to mean. (*People v. Sanchez* (2019) 7 Cal.5th 14, 49.)

In reviewing *Miranda* claims, we accept the trial court's resolution of disputed facts and evaluations of credibility if supported by substantial evidence (*People v. Enraca* (2012) 53 Cal.4th 735, 753), " 'but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269.)

## B.     Analysis

Following our review of the record, we find no evidence Jacinto clearly and unambiguously invoked his right to remain silent. Although Jacinto directs us to portions of the record which he submits show a clear invocation had occurred, when considered in the full context of the record, Jacinto's statements merely evince an unwillingness to discuss his supplier. That is not a clear invocation of his right to remain silent.

During the second part of the interrogation, Garibay asked Jacinto whether he wanted to speak with him, and Jacinto clearly responded, "No." After confirming Jacinto did not want to speak with him, Garibay continued to question Jacinto about the methamphetamine found in his home. Taken in isolation, the preceding exchange appears to establish a meritorious claim that Jacinto had invoked his right to remain silent, and that Garibay had failed to honor Jacinto's invocation. However, considering

8.

these statements in the full context of the record, Jacinto was merely refusing to provide information about his supplier.

Prior to asking Jacinto whether he wanted to speak with him, Garibay told Jacinto that their stated goal was "to catch the bigger drug dealer." Garibay subsequently explained Jacinto's "case [would] be erased" if he gave police "enough evidence that someone else is selling …." Garibay stated that if Jacinto were willing to cooperate with police, they would take him down to the police department to explain the process. When Garibay asked Jacinto if he would speak with him, Jacinto responded, "No." He subsequently reaffirmed his refusal when Garibay asked if he was sure. While Jacinto was unwilling to discuss details concerning his supplier, nothing upon this record indicates that he wanted to stop the interrogation and bar all further questions.

*People v. Silva* (1988) 45 Cal.3d 604 (*Silva*) is instructive. In *Silva*, the defendant waived his *Miranda* rights and answered several questions. (*Silva*, at p. 629.) When asked if he saw the murder victim's vehicle, or if he was driving a truck—which was used during the initial kidnapping of the victims— the defendant responded, " 'I don't know. I really don't want to talk about that.' " (*Id.* at pp. 629, 615−616.) The interrogation continued, with the defendant answering some questions and not others. Our Supreme Court concluded that the defendant's constitutional rights had not been violated, because "[a] defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' " (*Id.* at pp. 629−630.)

Here, as in *Silva*, Jacinto declined to provide details about his supplier. He did not however manifest a desire to terminate the interrogation. We therefore conclude Jacinto's post-*Miranda* statements to police were admissible.

Jacinto's reliance upon *People v. Harris* (1989) 211 Cal.App.3d 640 (*Harris*), *People v. Carey* (1986) 183 Cal.App.3d 99 (*Carey*), and *People v. Marshall* (1974) 41 Cal.App.3d 129 (*Marshall*) do not assist him.

9.

In *Harris*, several days after the defendant's roommate had been murdered, an investigating officer contacted the defendant and persuaded him to come back into town to "straighten it out." (*Harris*, *supra*, 211 Cal.App.3d at p. 645.) Immediately after the defendant was advised of his *Miranda* rights, interrogating officers asked him if he wanted to talk. He responded, " 'Not really.' " (*Ibid*.) One of the interrogating officers terminated the interview, turned off the tape recorder, and had the defendant indicate " 'No' " on a written waiver form. (*Id*. at pp. 645−646.) The appellate court held the defendant had unambiguously asserted his right to remain silent. (*Id*. at p. 649.)

In *Carey*, the defendant was given a *Miranda* warning. (*Carey*, *supra*, 183 Cal.App.3d at p. 103.) Immediately following the admonition, the police officer asked the defendant, " 'Having these rights in mind, do you wish to talk to me now?' " The defendant repeatedly stated, " 'I ain't got nothin' to say.' " (*Id*. at pp. 103−104.) The appellate court held the defendant had clearly invoked his right to remain silent. (*Id*. at p. 105.)

Finally, in *Marshall,* the defendant was admonished pursuant to *Miranda* and answered some initial questions about what happened the day his stepfather was murdered. (*Marshall*, *supra*, 41 Cal.App.3d at pp. 131–132.) When asked if he wanted "to go back over" details of his version of events preceding the murder—which he had omitted from his original statements to police—the defendant unequivocally answered, "No," twice. (*Id*. at p. 132.) The appellate court concluded that the defendant's unequivocal "no" amounted to a clear invocation of his right to remain silent. (*Id*. at p. 133.)

*Harris* and *Carey* involved refusals to speak to officers immediately after the defendants were admonished pursuant to *Miranda*. *Marshall* addressed a subsequent invocation of the defendant's right to remain silent. The instant case does not involve an invocation at all.

Here, in the full context of the record, Jacinto did not invoke his right to remain silent. He refused to speak to Garibay about his supplier, but he did not indicate a refusal to speak to Garibay generally. Thus, *Harris*, *Carey*, and *Marshall* are distinguishable from the present case.

We conclude the record contains insufficient evidence to support Jacinto's assertion that he clearly and unambiguously invoked his right to remain silent during his police interrogation. Because we conclude the trial court did not err by ruling Jacinto's post-*Miranda* statements admissible, we need not reach the issue of whether any error was prejudicial under *Chapman v. California* (1976) 386 U.S. 18.

## **DISPOSITION**

The judgment of conviction is affirmed.