Filed 4/8/13  P. v. Parra CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GUILLERMO SERVIN PARRA,<br><br>Defendant and Appellant. | B240025<br><br>(Los Angeles County<br>Super. Ct. No. VA116216) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Thomas McKnew, Jr., Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven E. Mercer and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Guillermo Parra (defendant) guilty on ten counts of aggravated sexual assault of a minor and two counts of rape. On appeal, defendant contends that the trial court erred in denying his pretrial motion to suppress statements he made to a police investigator because prior to making the statements, defendant unambiguously invoked his Fifth Amendment right to remain silent. Defendant further contends that the trial court erred by failing to give instructions on lesser included offenses of rape. And defendant argues that the cumulative effect of these claimed errors deprived him of a fair trial.

We hold that because defendant did not unambiguously invoke his Fifth Amendment right to remain silent during the police interview in question, the trial court did not err in denying his suppression motion. We further hold that the trial court did not have a sua sponte duty to instruct the jury on lesser included offenses of rape. Therefore, we affirm the judgment of conviction.

# FACTUAL BACKGROUND

## A.    Prosecution's Case

T.H., who was eighteen at the time of trial, and her older brother and sister came to live with their aunt E. in the City of South Gate when T. was seven years old. T.'s aunt was living with defendant at the time. T. did not have any relationship with her biological parents. Her aunt picked up T. and her siblings in Mexico and brought them to live with her in the United States. T.'s aunt was like a mother to her, and defendant was like a father.

When T. was seven or eight years old, defendant began touching her inappropriately. He kissed her on the mouth and touched her private parts. After T. turned nine, defendant engaged in further sexual activity with her. Every Saturday morning, T.'s aunt would run errands with T.'s two older siblings, leaving T. alone with

2

defendant. Her aunt would leave home between 8 and 10 in the morning and not return until early afternoon. Defendant would take T. into his bedroom, remove her clothes, and place his penis inside her. He would also kiss her vagina and breasts and make her perform oral sex on him. This conduct continued every Saturday from the time T. was nine until she was fifteen, when it stopped.

According to T., defendant would threaten and intimidate her by telling her that if she "said something or spoke, . . . [her] family would break apart." Based on those threats, she was afraid that her family would not stay together. At the time of trial, T. no longer lived with her aunt and no longer spoke to her.

At the time of defendant's arrest, City of South Gate Detective Carlos Fernandez worked in the Sex Crimes Division and had investigated over 1000 cases involving sexual assaults on children. He had specific training and experience in investigating cases such as this one and, because of his senior status, had trained other officers to conduct such investigations.

Detective Fernandez conducted an investigation in this case, including interviews with T. and defendant. He interviewed defendant in Spanish, a language in which the detective was fluent, and recorded the interview. After beginning the interview with a "get-to-know [each other] session," Detective Fernandez read defendant his *Miranda*[1] rights. Defendant confirmed that he understood his *Miranda* rights and agreed to speak with the detective.

Detective Fernandez's first interview with defendant lasted over an hour. During that interview, the detective tried to establish "commonality" with defendant by, inter alia, talking about the region of Mexico where defendant had resided.[2] Detective Fernandez did not yell or raise his voice during the first interview, nor did he threaten or

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]     Defendant informed the detective during the first interview that he had been "a litigator" in Mexico.

3

attempt to coerce defendant. He eventually ended the first interview[3] with defendant, and, a little over an hour later, he conducted a second interview with defendant.

The recording of the second interview, which lasted about 15 minutes, was played for the jury and the jurors were provided transcripts with an English translation. During the second interview, defendant provided the following information: Defendant denied ever penetrating T., but admitted that he placed his penis on her vagina "[s]ome three times." One time, while defendant was sitting down, T. sat on him and he became excited and wanted "to come already." Defendant also denied engaging in anal intercourse with T., but then stated, "Look, this is all right already. I will pay for this for everything that I have done. [¶] . . . [¶] But—I mean no more than that, no." Defendant further stated, "what will be will be. No. I don't know—I'm so dizzy that I didn't even drink today."

When Detective Fernandez asked defendant whether he had touched T.'s vagina with his penis only three times, defendant said, "No. There were more times." In response to the detective's inquiry whether the contact occurred once or twice a month, defendant suggested it was not that frequent, stating, "No. Already further—further apart."

Detective Fernandez next asked if defendant ever "gave [T.] oral sex," to which defendant replied, "Me to her yes." According to defendant, he would always give T. oral sex in the house. But he denied that T. gave him oral sex.

Following further questioning, defendant again stated that " . . . I am willing then—because I have to pay for what I did." When Detective Fernandez asked defendant "How [he] would . . . do it," defendant replied that he "would get on top," but added that "[o]ne time she did get on top [¶] . . . [¶ and she wanted to penetrate," but defendant "stopped."

Toward the end of the second interview, Detective Fernandez asked defendant, what he would say to T. if he could speak to her, and defendant replied, "that she forgive

---

[3] Further statements defendant made during the first interview are discussed in connection with the motion to suppress, *post*.

4

me because I'm going to pay for what I have done." The detective thanked defendant for his honesty and defendant said, "Thanks to you it's that I was very tense before."

## B.    Defense Case

Defendant testified on his own behalf as follows:

Defendant first met T. when she was eight or nine years old. He thought of her as a daughter and called her daughter. He also thought of her old brother and sister as his children.

During the first interview with Detective Fernandez, the detective was "charismatic" and very friendly. Defendant and the detective discussed different regions of Mexico. At some point during that first interview, which lasted about an hour, the detective informed defendant about T.'s allegations against him, including that defendant had raped her and had sex with her. According to defendant, those allegations were lies and he explained that to Detective Fernandez.

Prior to the first interview, defendant had a discussion with T. about school. T.'s brother and sister also participated in the discussion. Defendant told T. that because her brother, who was paying for T.'s school, was "getting out of high school," the family needed to determine how T.'s schooling could continue as "what [defendant] earned at the taco place was very little." Defendant also told T. she was not paying attention to her studies because she had a boyfriend. But T. denied having a boyfriend. Later that same evening, T.'s brother told defendant that T. had lied about not having a boyfriend and that the boyfriend would come to the house to see her. When defendant and T.'s brother went outside to discuss the matter, T. and her sister, who had overheard defendant talking to her brother, left the house and did not return that night.

During the first interview with Detective Fernandez, defendant told him more than once that T.'s allegations were not true. When the detective continued talking, defendant began to feel uncomfortable. When the detective would not allow defendant to participate in the discussion, and instead kept talking, defendant felt as if he was being accused of something he did not do. Defendant began to feel as if he should confess to

5

something because the detective told him the detective had experience in these types of cases and had written several books. At some point, defendant told the detective he wanted to return to his cell.

Between the first and second interviews, Detective Fernandez spoke to defendant in his cell without a recorder. The detective told defendant that he should "acknowledge" what T. was saying, but defendant protested that he had not done anything. Based on the detective's tone and his threat that the police could detain E. and T.'s brother, defendant agreed to sign what the detective wanted him to sign so that nothing would happen to defendant's family. The detective replied, "[N]o. Not that way." Defendant countered, "Whatever [the detective was] accusing [him] of, [he would] sign it." The detective explained that defendant would need "to accept something." According to the detective, "it would be convenient for all of [them]" if defendant admitted to giving oral sex to T. Defendant agreed.

When defendant subsequently admitted to certain things in the second interview, such as touching T.'s vagina with his penis and giving her oral sex, he did so because he believed it would cause the police to refrain from "bothering" his family. But he did not think those admissions would result in criminal charges because he believed a physical examination of T. would show she was lying.

Defendant denied ever giving T. oral sex, touching her vagina with his penis, or putting his penis inside her vagina. Defendant also denied ever being alone with T. on Saturdays and was convinced that eventually T. would tell the truth.

### C. Rebuttal

Following defendant's testimony, the prosecution recalled Detective Fernandez. During the first interview, the detective explained to defendant that he had no power to file any charges against defendant and that he just investigated and wrote reports in cases. He also explained to defendant that only the district attorney had the power to file charges against defendant. In addition, Detective Fernandez informed defendant that he had no power to offer defendant any type of leniency.

6

Detective Fernandez denied that he had an unrecorded interview with defendant between the first and second recorded interviews and confirmed that he did not speak with defendant at all between those interviews. The detective had no animosity toward defendant and was handling 200 other open cases in addition to defendant's.

According to the detective, it was not his practice to ask suspects for written confessions. But if a suspect offered to sign a written confession, the detective would accept that offer "in a heartbeat" because his work on the case would be over.

## PROCEDURAL BACKGROUND

In an amended information, the Los Angeles County District Attorney charged defendant in counts 1 through 12 with aggravated sexual assault of a child in violation of Penal Code section 269, subdivision (a)(1)[4], and alleged that defendant, who was seven or more years older than the victim, T., raped her when she was under the age of 14 years. In counts 13 and 14, the District Attorney charged defendant with forcible rape in violation of section 261, subdivision (a)(1). Defendant pleaded not guilty.

At the close of the prosecution's case, defendant moved pursuant to section 1118 to dismiss counts 1 and 2 and the trial court granted that motion. Following trial, the jury found defendant guilty on the ten remaining aggravated sexual assault counts and the two rape counts.

At the sentencing hearing, the trial court sentenced defendant to ten consecutive 15-years-to-life sentences on the aggravated sexual assault counts and two consecutive six-year middle term sentences on the two rape counts, for an aggregate sentence of 162 years-to-life.

---

[4] All further statutory references are to the Penal Code unless otherwise indicated.

7

## DISCUSSION

### A.    Motion to Suppress

Defendant contends that during the first interview with Detective Fernandez, he unambiguously invoked his Fifth Amendment right to remain silent. According to defendant, because he exercised his right to remain silent, any statements he made during the second interview were inadmissible.

#### 1.    *Background*

Prior to trial, defendant moved to suppress the recording and transcript of his second interview with Detective Fernandez. In support of that motion, defendant specified three separate statements he made during the first interview with the detective as the factual predicate for the motion.[5]

Defendant made the first statement following these comments by Detective Fernandez: "Do you remember that I told you that I understand why those things occur? I know that in that culture of—of being Mexicans, a person that does those things is seen as the worst of the trash. That is not really the reality. There are times that people don't know how to show the affection, the love to the children. To the—to the young ladies. The only way they know to do it is showing them physical attention. That occurs. There was no torture that I've seen in other cases. There was no rape through beatings. There was not where you tied her up and left her locked up in a room and just had sex with her whenever you wanted without feeding her. No. She had a free life. And there was some point she enjoyed it. And I don't doubt that there were some cir—circumstances where she took advantage of the sex and asked you for things in exchange for sex. Those things occur. She's a woman."

---

[5]    To the extent that defendant is asserting additional statements he made in the first interview as support for his contentions on appeal, he forfeited any contention based on such statements by failing to raise them in the trial court. (*People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9.)

In response, defendant made the first statement on which he relied in the trial court: "I don't want to talk anymore." The detective replied by stating "Uh-huh. I understand, I understand, I understand. There are many things that are going through your head. The damage—the damage is already done. Now, if you want to continue doing her more damage, because if you tell me that nothing—I have to go and interview her again because why is she lying. Do you remember that I told you that you are just as important [as] she is? I have to give the same credence to you that I give to her. I have to interview her again anew." Defendant then asked the detective to speak with T. "Well yes, I would like that you talk with her so that she [U/I] end to deceive. And already, and with all respect there must—well, if that supposedly says that she is pregnant from—from me—that—that—."

Prior to defendant's second statement, Detective Fernandez stated as follows: "Have you ever played poker sir? Cards? O you were a l—litigator, you were an attorney. You know that you wouldn't be here if I didn't have with—if we didn't have evidence against you. Okay. Right now the only that—what you also attempt is I have the statement of many people. Only yours is missing. [¶] . . . [¶] Uh-huh. For what you did. She liked it, didn't like it, you forced her, didn't force her, have some problems, don't have problems, were drugged, were drunk. The question is—no the question is not if it occurred or didn't occur. The question is, why did it occur? And how many times did it occur. She is saying that it occurred every day. [U/I]."

In response, defendant made the second statement on which he relied in the trial court: "I don't—don't—don't want to say anything because—that is—I work at—at night. When this—I come from work my wife is there. [¶] . . . [¶] I go to sleep. [¶] . . . [¶] I get up at six in the evening and I go to work. [¶] . . . [¶] I go to work at 8:00 at night."

Prior to the defendant's third statement, Detective Fernandez and defendant had the following exchange: [Detective]: "The damage is already done. . . . [T.] already hea-hea—healed from the physical damage. If she was pregnant from you, wasn't pregnant from you already that has already happened. It's been already three years from

9

that. Already that is already done and it's already happened. It's been two years that you stopped. Why you stopped, I don't know. I imagine that you recognized that what you were doing and you stopped already. Okay. Don't continue the abuse of [T.]. Because now it already is me—mental abuse. Not without denying you abuse a person mentally, I am not going to charge you with that but you know, you're intelligent. [Defendant]: It's not it's the things. [Detective]: Tell me how they were then."

In response, defendant made the third statement on which he relied in the trial court: "I don't want to talk." The detective responded by saying, "Tell me how they were, explain it to me." Defendant replied, "No." Detective Fernandez and defendant then had this additional exchange: [Detective]: "If you—then you raped her every eight days? Is—okay. If it wasn't like I think that the having relations, if you were raping her every eight days. Or you raped her every day. She refused and you forced her. You threatened her? What was it that you did? In what way did you rape her? She defended herself and she shouted for you to stop? It hurt her, she bled, did—how many times did you get her pregnant? You didn't use condoms. Can your wife have children? [Defendant] Uh . . . [E.]? [Detective]: Uh-huh. [Defendant] No. [Detective]: Okay. That is important for me. Because the letter said that you wanted children. [Defendant]: That I wanted children? [Detective]: Uh-huh. That you told her that—that you wanted a child. [Defendant]: Not even, I don't even understand."

### 2.    *Standard of Review*

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125 [23 Cal.Rptr.3d 295, 104 P.3d 98].) [If] what [the] defendant . . . said during his police interview is undisputed, we engage in a de novo review of the legal question of whether the statement at issue was ambiguous or equivocal." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

10

### 3. Applicable Law

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' (*Miranda*, *supra*, 384 U.S. 436, 479; see *Connecticut v. Barrett* (1987) 479 U.S. 523, 528 [93 L.Ed.2d 920, 107 S.Ct. 828].) If the suspect knowingly and intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' (*Miranda*, at p. 474; see *id*. at pp. 444-445, 473-475, 479.)" (*People v. Martinez* (2010) 47 Cal.4th 911, 947.)

"In *Davis v. U.S.* (1994) 512 U.S. 452 [129 L.Ed.2d 362, 114 S.Ct. 2350] (*Davis*), the United States Supreme Court explained that to invoke the *right to counsel* during an interrogation, a suspect must 'articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' (*Id*. at p. 459.) 'If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.' (*Id*. at pp. 461-462.) Although 'when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney,' the high court specifically declined to adopt a 'stop and clarify' rule that would require officers to ask clarifying questions about whether the right was being invoked. (*Id*. at p. 461.)" (*People v. Martinez, supra*, 47 Cal.4th at p. 947.)

"In the absence of any contrary authority from the high court, we have also applied *Davis*'s articulation standard to ambiguous statements made in the context of a suspect's invocation of the right to remain silent. (Fn. omitted.) As we stated in *People v. Stitely* (2005) 35 Cal.4th 514, 535 [26 Cal.Rptr.3d 1, 108 P.3d 182], '[i]n order to

11

invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect "must *unambiguously*" assert his right to silence . . . .' (See also *People v. Rundle* (2008) 43 Cal.4th 76, 114 [74 Cal.Rptr.3d 454, 180 P.3d 224].)  In addition, we also concluded that the 'stop and clarify' rule does not apply to ambiguous assertions of the right to silence.  'Faced with an ambiguous or equivocal statement, law enforcement officers are not required . . . either to ask clarifying questions or to cease questioning altogether.' (*People v. Stitely*, *supra*, 35 Cal.4th at p. 535; see also *People v. Rundle*, *supra*, 43 Cal.4th 76, 115)  (Fn. omitted.)" (*People v. Martinez, supra*, 47 Cal.4th at pp. 947-948.)

In his treatise, California Confessions Law, Judge O'Neill analyzed the California cases dealing with ambiguous statements made in the context of a suspect's invocation of the right to remain silent.  "California appellate courts have been quite tolerant of continued interrogations following expressions of reluctance which are not clear invocations.  The statement at issue must be considered in context.  Thus, when a suspect who had given exculpatory statements was emphatically accused of lying by interrogating officers, the response 'That's all I have to say' was interpreted to mean 'that's my story and it will not change,' rather than a request to terminate the interview. (*In re Joe R.*, 27 Cal.3d 496, 516 165 Cal.Rptr. 837, 612 P.2d 927 (1980).  See also *People v. Martinez*, 47 Cal.4th 911, 949, 105 Cal.Rptr.3d 131, 224 P.3d 877 (2010), cert. denied, 131 S.Ct. 75, 178 L.Ed.2d 51 (2010) (no invocation where suspect, having been asked why he would be accused of an assault he didn't commit, stated, 'That's all I can tell you.'); *People v. Williams*, 49 Cal.4th 405, 433, 111 Cal.Rptr.3d 589, 233 P.3d 1000 (2010), as modified, (Aug. 18, 2010) and cert. denied, 131 S.Ct. 1602, 179 L.Ed.2d 505 (2011) (no unequivocal invocation where, near the end of a lengthy valid interview, suspect responded to police disbelief of his denials by stating, 'I don't want to talk about it.').)  [¶]  Even a reference by a suspect to his attorney's advice to be silent was held not to be an invocation where the context indicated it was mentioned to emphasize the suspect's decision to ignore such advice. (*People v. Thompson*, 50 Cal.3d 134, 165, 266 Cal.Rptr. 309, 785 P.2d 857 (1990).  See also *Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th

12

Cir. 2008).) [¶] Several cases involve statements interpreted as a refusal to answer specific questions or go into further detail, an unwillingness to be questioned by a particular officer, or an attempt to alter the course of questioning rather than terminate it. (See *People v. Hayes*, 38 Cal.3d 780, 783, 214 Cal.Rptr. 652, 699 P.2d 1259 (1985) (reluctance to give details after suspect admitted he 'did it all' not invocation); *People v. Silva*, 45 Cal.3d 604, 629, 247 Cal.Rptr. 573, 754 P.2d 1070 (1988) ('I really don't want to talk about that' was indication of unwillingness to discuss a certain subject rather than an invocation); *People v. Jennings*, 46 Cal.3d 963, 979, 251 Cal.Rptr. 278, 760 P.2d 475 (1988), as modified, (Nov. 10, 1988) (statements including 'That's it, I shut up' were expressions of frustration with interviewing officer rather than invocation); *People v. Ashmus*, 54 Cal.3d 932, 969, 2 Cal.Rptr. 2d 112, 820 P.2d 214 (1991) (no invocation where suspect sought to alter the course of questioning when incriminating witness was first mentioned; suspect's statements included '. . . now I ain't going to say no more.'); *People v. Musselwhite*, 17 Cal.4th 1216, 1238, 74 Cal.Rptr.2d 212, 954 P.2d 475 (1998), as modified on denial of reh'g, (June 24, 1998) (in context, suspect stating he was confused and nervous and 'I don't want to talk about this' was mere reluctance to address a specific topic, not an invocation); *People v. Castille,* 129 Cal.App.4th 863, 885, 29 Cal.Rptr.3d 71 (1st Dist. 2005) (no invocation where murder suspect hesitated and asked, 'Do I have to talk about this right now?' as he was about to describe seeing the victim after the shooting); *People v. Vance*, 188 Cal.App.4th 1182, 1211, 116 Cal.Rptr.3d 98 (1st Dist. 2010) (no invocations despite suspect stating 'I don't have a side of the story' and 'I don't want to talk about it'); *Sechrest v. Ignacio*, 549 F.3d 789, 806 (9th Cir. 2008) (no invocation where suspect who had waived stated, 'You ask me some questions, and if I want to answer some questions I will answer them, and if not, I won't.'; interview was properly continued after clarifying question).)" (O'Neill, California Confessions Law (2012 ed.) § 8:18, pp. 213-214.)

### 4. Analysis

None of the three statements at issue on defendant's motion to suppress was an unambiguous invocation of defendant's Fifth Amendment right to remain silent. The first statement, "I don't want to talk anymore," when read in the context of Detective Fernandez's preceding statements could reasonably be interpreted as defendant saying he did not want to talk about T. having sex in exchange for favors or about the violent sex the detective was describing. Moreover, following that statement, defendant engaged the detective by suggesting that the detective should speak with T. again and by denying that he impregnated T. Thus, in that specific context, a reasonable police investigator would not have understood that defendant wanted to terminate the interview and exercise his right to remain silent.

Defendant's second statement, "I don't . . . won't say anything because . . . I work at—at night," was also ambiguous. When read in the context of his subsequent statements about his work schedule, the second statement appears to be an explanation of why he could not have been having sex with T. everyday as she claimed, i.e., he worked nights and when he came home, his wife was always there. It therefore could be reasonably interpreted as a denial of T.'s allegation of daily sex, rather than an unambiguous request to terminate the interview.

Defendant's third statement, "I don't want to talk," must also be read in context. It could reasonably be construed as a refusal to explain further defendant's denial that he was mentally abusing T. When the detective suggested that defendant was mentally abusing T. by denying her allegations, defendant responded in the negative— "It's not it's the things." When the detective asked defendant to "[t]ell [him] how [things] were then," defendant responded that he did not want to talk, presumably about how things were. When the detective again implored defendant to "[t]ell [him] how [things] were, explain it to me," defendant refused, but immediately thereafter he engaged the detective when the subject turned to T.'s pregnancy. A reasonable investigator in the detective's position could have concluded that defendant was not expressing a desire to end the interview, but rather was refusing to explain further a specific subject matter.

14

## B. Jury Instruction on Lesser Included Offense

Defendant contends that the trial court committed prejudicial error when it failed to instruct the jury sua sponte on lesser included offenses of rape. According to defendant, his admissions in the second interview of sexual contact with T., but not sexual intercourse, supported a reasonable inference that he could only be guilty of assault and battery.

"'A court must generally instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so. [Citation.]' (*People v. Horning* (2004) 34 Cal.4th 871, 904-905 [22 Cal.Rptr.3d 305, 102 P.3d 228] (*Horning*); see *People v. Valdez* (2004) 32 Cal.4th 73, 115 [8 Cal.Rptr.3d 271, 82 P.3d 296].) '[T]he sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued.' (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)" (*People v. Beames* (2007) 40 Cal.4th 907, 926.) "[A] trial court, [however,] need not instruct the jury on a lesser included offense where no evidence supports a finding that the offense was anything less than the crime charged. ([*People v. Barton* (1995) 12 Cal.4th 186,] 196, fn. 5; see *People v. Breverman*[, *supra*,] 19 Cal.4th [at p.] 149 [77 Cal.Rptr.2d 870, 960 P.2d 1094]; *People v. Anderson* (1983) 144 Cal.App.3d 55, 61 [192 Cal.Rptr. 409].)" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) The issue of whether a trial court should have instructed on a lesser included offense is reviewed under an independent or de novo standard of review. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

Defendant's self-serving admissions that he had sexual contact with T., but no intercourse, did not support a reasonable inference that he committed only assault and battery, not aggravated sexual assault or rape. T. testified that defendant had sexual intercourse with her weekly from the time she was nine until she turned 15. In response to those accusation, defendant initially denied them outright and then made the admissions on which he relies. At trial, however, he again denied having any sexual contact with T. Given his denials and T.'s testimony, defendant's admissions during the

15

second interview were not credible or reasonable. Therefore, they were insufficient to support a sua sponte instruction on the lesser included offenses of assault and battery.

### C.    Cumulative Error

Defendant contends that even assuming the two errors of which he complains were harmless individually, the cumulative effect of those errors prejudiced his right to a fair trial. Because we have concluded that the trial court did not err as defendant contends, there was no cumulative error.

### DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, Acting P.J.

We concur:

KRIEGLER, J.

O'NEILL, J.*

_____

\*    Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16